**UNITED STATES of America, Plaintiff,**

v.

**Russell T. HAWLEY and Hawley Insurance, Inc., Defendants.**

No. C 06–4087–MWB.

United States District Court, N.D. Iowa, Western Division.

June 23, 2008.

Martha A. Fagg, U.S. Attorney's Office, Sioux City, IA, for Plaintiff.

Bruce Brian Green, Philip J. Willson, Willson & Pechacek, PLC, Council Bluffs, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' MOTIONS IN LIMINE

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................1021

II. LEGAL ANALYSIS .............................................1023
 A. Rule 104 .................................................1023
 B. The Government's Motion ...............................1023
 1. The evidence at issue ..............................1023
 2. Admissibility of evidence of reimbursement and payment procedures .......................................1023
 a. Arguments of the parties .....................1023
 b. Analysis ....................................1024
 C. The Defendants' Motion ................................1027
 1. The evidence at issue ..............................1027
 2. Evidence disclosed after the close of discovery .......1027
 a. Arguments of the parties .....................1027
 b. Analysis ....................................1029
 3. Hawley's tax returns and other financial information ...1032
 a. Arguments of the parties .....................1032

 b. *Analysis* .................................................1033
 4. *References to "experts"* ...........................................1035
 a. *Arguments of the parties* .....................................1035
 b. *Analysis* .................................................1035
 5. *Expert opinions on legal issues and results to reach* .................1038
 a. *Arguments of the parties* .....................................1038
 b. *Analysis* .................................................1039
 6. *Evidence that Hawley signed the names of insureds* .................1043
 a. *Arguments of the parties* .....................................1043
 b. *Analysis* .................................................1044
 i. *Hawley's forgery of signatures* ....1044
 ii. *Hawley's acceptance of forged signatures* ....1046
 7. *Other "bad acts" evidence* ........................................1046
 a. *Arguments of the parties* .....................................1046
 b. *Analysis* .................................................1047
 i. *Other crop years and other crop land* ....1047
 ii. *Evidence of Hawley's involvement in bankruptcy fraud*....1047
 8. *Memoranda of witnesses' statements* ..............................1048
 a. *Arguments of the parties* .....................................1048
 b. *Analysis* .................................................1049
 i. *Admissibility pursuant to Rule 803(5)* ....1050
 ii. *Use pursuant to Rule 612* ....1050
 9. *Evidence of plea agreements* .....................................1052
 a. *Arguments of the parties* .....................................1052
 b. *Analysis* .................................................1053

III. **CONCLUSION** .....................................................1054

## I. INTRODUCTION

In this civil action by the United States against defendants Russell T. Hawley and Hawley Insurance, Inc., (collectively "Hawley"), the United States alleges that Hawley engaged in improper conduct that allowed ineligible farmers to obtain and make claims against multi-peril crop insurance (MPCI) policies that were sold by Hawley, issued by North Central Crop Insurance (NCCI), and reinsured by the Federal Crop Insurance Corporation (FCIC), for certain crop land in South Dakota. The factual background to this action is set forth in some detail in the court's April 3, 2008, ruling on the parties' cross-motions for summary judgment. *See United States v. Hawley,* 544 F.Supp.2d 787, 791–94 (N.D.Iowa 2008).

For present purposes, suffice it to say that the government alleges that Hawley knew that Ed Marshall owned the crop land in question, that Mark Hoffman had rented the land from Ed Marshall, and that Donald Kluver was actually farming the land in 2000. Nevertheless, Hawley submitted to NCCI a crop insurance application for the 2000 crop year in the names of Sydney and Stanley Winquist for an interest in crops on the crop land. The Winquists later made claims against the MPCI policy on which the FCIC ultimately reimbursed NCCI for crop insurance indemnities and paid premium subsidies for the 2000 crop year totaling $145,540. The Winquists and Kluver were later prosecuted for conspiring to make fraudulent crop insurance claims relating to the crop land for crop year 2000. Kluver entered into a plea agreement and the Winquists entered into pretrial diversion agreements.

Similarly, the government alleges that, just before the application deadline for the 2001 crop year, Hawley submitted to NCCI an application for crop insurance for the crop land in the name of, and purportedly signed by, Ed Marshall. The application had been hand-delivered to Hawley by

Mark Hoffman, so Hawley had not seen Marshall sign the application. The FCIC eventually made payments for indemnity payments for crop losses claimed by Marshall and paid premium subsidies on the crop land for the 2001 crop year totaling $159,960. Ed Marshall signed a civil settlement agreement with the United States Attorney's Office for the Northern District of Iowa in which he admitted that he had not signed a timely application for crop insurance nor had he instructed anyone to sign such an application on his behalf and pursuant to which he repaid part of the overpayment alleged.

The United States originally brought claims pursuant to 31 U.S.C. § 3729(a)(1), (a)(2), and (a)(3) of the False Claims Act (FCA), and common-law claims of fraud and payment under mistake of fact. However, the court granted summary judgment in favor of the defendants on **Count One,** the FCA claim pursuant to 31 U.S.C. § 3729(a)(1) alleging "presentation of a false claim," and as to **Count Five,** the common law claim for "payment under mistake of fact," but otherwise denied the defendants' motion for summary judgment. See id.[1] Therefore, this matter is scheduled for trial to begin on June 30, 2008, on the following claims: **Count Two,** the "false record or statement" claim, in which the United States asserts a claim pursuant to 31 U.S.C. § 3729(a)(2) of the FCA alleging that the defendants knowingly made, used, or caused to be made or used false records or statements in order to get false or fraudulent claims paid or approved by the United States; **Count Three,** the "conspiracy" claim, in which the United States asserts a claim pursuant to 31 U.S.C. § 3729(a)(3) of the FCA alleging that the defendants conspired with others to get false or fraudulent claims allowed or paid by the United States in that the defendants entered into an agreement to submit and process false and fraudulent information in order for ineligible individuals to receive indemnities that would ultimately be reimbursed by the United States through the Federal Crop Insurance Corporation (FCIC); and **Count Four,** the "common-law fraud" claim, in which the United States alleges that the defendants engaged in common-law fraud by making or using false records and statements or by concealing the true facts surrounding the individuals actually owning the farmland on which MPCI policies were issued and claims were made, knowing that the misrepresentations or concealments were material and knowing and intending that the United States would rely upon them, thereby causing the United States damages. For purposes of the Jury Instructions in this case, the remaining claims will be renumbered as **Counts One** through **Three.**

In anticipation of trial, both Hawley and the United States filed motions in limine on May 28, 2008. See Plaintiff's Motion In Limine To Bar Reference To Treble Damages, Penalties, And Reimbursement And Payment Procedures Between The Federal Crop Insurance Corporation (FCIC) And North Central Crop Insurance, Inc. (NCCI) (docket no. 33); Defendants' Motion In Limine Or In The Alternative, For Preliminary Rulings Under Fed.R.Evid. 104(a) (docket no. 34). On June 4, 2008,

---

1. Although the Supreme Court just recently issued a decision in *Allison Engine Co., Inc. v. United States ex rel. Sanders,* —— U.S. ——, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008), on FCA claims under all three subsections of § 3729(a), this court does not find that the Supreme Court's decision changes the dispo-

sition of the parties' cross-motions for summary judgment on the FCA claims in this case. On the other hand, the Supreme Court's decision in *Sanders* may change particulars of the Jury Instructions on and the requirements for proof of the remaining FCA claims in this case.

Hawley filed a Resistance (docket no. 37) to the motion by the United States, and on June 6, 2008, the United States filed a Resistance (docket no. 38) to Hawley's motion. Hawley filed a Reply (docket no. 39) in support of its Motion In Limine on June 13, 2008. The parties did not request oral arguments on their motions in the manner required by applicable local rules, and the court has not found oral arguments to be necessary. Therefore, the court will rule on the motions on the basis of the parties' written arguments.

## II. LEGAL ANALYSIS

### A. Rule 104

As a preliminary matter, the court notes that Rule 104 of the Federal Rules of Evidence provides, generally, that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court...." FED.R.EVID. 104. Such preliminary questions may depend upon such things as whether the factual conditions or legal standards for the admission of certain evidence have been met. *See id.*, Advisory Committee Notes, 1972 Proposed Rule. This rule, like the other rules of evidence, must be "construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that truth may be ascertained and proceedings justly determined." FED.R.EVID. 102. The court concludes that preliminary determination of the admissibility of evidence presented or challenged in the parties' evidentiary motions will likely serve the ends of a fair and expeditious presentation of issues to the jury. Therefore, the court turns to consideration, in turn, of the admissibility of the evidence put at issue in the parties' pretrial evidentiary motions.

### B. The Government's Motion

#### 1. The evidence at issue

In its Motion In Limine, the government seeks to exclude two categories of evidence: (1) any references to provisions of the FCA permitting the court to award treble the damages awarded by the jury, 31 U.S.C. § 3729(a), and to award a civil penalty of not less than $5,000 and not more than $10,000 (now $5,500 to $11,000) for each FCA violation found by the jury, 28 C.F.R. § 85.3(a)(9); and (2) any reference to the FCIC reimbursement and payment procedures with NCCI. Hawley does not resist exclusion of the first category of evidence, but does resist exclusion of the second category of evidence. Therefore, the court will grant the first portion of the government's Motion In Limine, but will give further consideration to the second portion.

#### 2. Admissibility of evidence of reimbursement and payment procedures

##### a. Arguments of the parties

■ In the disputed part of its Motion In Limine, the government seeks to exclude any reference to the FCIC reimbursement and payment procedures with NCCI as irrelevant under Rules 401, 402, and 403 of the Federal Rules of Evidence. The government argues that FCIC and NCCI entered into a Standard Reinsurance Agreement (SRA), which governs their relationship pursuant to the policy provisions and approved procedures of the federally reinsured MPCI program. The government argues that the SRA is lengthy and technical, setting forth complex procedures for premium subsidies and loss reimbursements when an MPCI policy is written and a loss claim is filed with NCCI. However, the government argues that the details of this complex procedure are confusing and irrelevant to the jury's

deliberations in this case. The government notes that, in a deposition of Calvin D. Brewer, Section Chief of the Reinsurance Accounting and Eligibility Tracking Section for the Risk Management Agency, Hawley's counsel delved into the "behind the scene" manipulation of the total financial relationship between FCIC and NCCI. However, the government contends that the relevant damages suffered by FCIC are the actual premium subsidies and the total loss payments paid to the ineligible farmers that were reimbursed to NCCI by FCIC. Thus, the government asserts that all other procedures for premium subsidy and loss reimbursement do not affect the amount of money that the farmer actually receives from the MPCI program.

Hawley counters that, under the SRA, the FCIC assigned a portion of the indemnity losses, NCCI ultimately paid a portion of the indemnity losses, and the government also retained and offset from the indemnity losses the premiums paid by the insureds. Moreover, Hawley asserts that the Supreme Court has ruled in *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), that a defendant in a FCA case is entitled to a credit for any amounts recovered by the government from another party. Hawley argues that, here, because the government retained premiums paid by each of the insureds at issue in the case, and recouped from NCCI a percentage of the indemnities paid to the insureds, the evidence of the SRA provisions providing for such credits is relevant. Hawley also points out that it appears from the government's Exhibit List that the government intends to offer the SRA into evidence and to solicit testimony regarding the operations of the SRA. Therefore, Hawley argues that the court should not permit the government to present favorable evidence regarding the operations of the SRA, but limit Hawley's ability to use the SRA provisions that

show that the government has retained premiums paid by the insureds and recouped some of its losses from NCCI. Finally, Hawley contends that excluding evidence of the amounts recouped by the government may lead to an excessive fine in violation of the Eighth Amendment to the United States Constitution, where the treble damages and fines provisions bring the FCA within the ambit of the Eighth Amendment, citing *United States v. Mackby*, 339 F.3d 1013 (9th Cir.2003).

### b. Analysis

Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. Rue 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority" and that "[e]vidence which is not relevant is not admissible." FED.R.EVID. 402. Rule 403 provides for exclusion of even relevant evidence on various grounds, as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED.R.EVID. 403. Here, the United States seeks to exclude the evidence concerning the SRA's reimbursement and payment procedures on the grounds that it is irrelevant, pursuant to Rules 401 and 402, and confusing, pursuant to Rule 403, but not on

the ground that it is otherwise unfairly prejudicial. " 'Confusion of the issues warrants exclusion of relevant evidence if admission of the evidence would lead to litigation of collateral issues.' " *Firemen's Fund Ins. Co. v. Thien,* 63 F.3d 754, 758 (8th Cir.1995) (quoting *United States v. Dennis,* 625 F.2d 782, 796–97 (8th Cir. 1980)).

As to relevance, the court disagrees with Hawley's contention that *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), stands for the broad proposition that a defendant in a FCA case is entitled to a credit for any amounts recovered by the United States from another party. Rather, *Bornstein* stands for the quite different proposition that a tortfeasor, such as a subcontractor, is entitled to a credit for compensation that the United States has recovered from another tortfeasor, such as a prime contractor, but only *after* doubling (now trebling) the damages for the government's "original loss." *See Bornstein,* 423 U.S. at 314–17, 96 S.Ct. 523. Moreover, nothing in *Bornstein* suggests that the credit for amounts recovered from another tortfeasor is an adjustment for the jury to make in determining actual damages; rather, the Court determined that the adjustment should be made *by the court* and only *after* doubling (or now trebling) the actual damages found by the jury. *Id.; see also* 31 U.S.C. § 3729(a) (now providing for trebling of actual damages). Thus, the adjustments at issue in *Bornstein* were not matters for the jury at all. Here, NCCI is not a tortfeasor, even if NCCI reimbursed the government for some part of its indemnity loss pursuant to the SRA, and the retention of premiums

paid by the insureds was pursuant to the SRA, not because the insureds turned out to be ineligible and, thus, turned out to be tortfeasors. Therefore, the adjustment in *Bornstein* is not applicable here to any determination of damages by the jury.

Nevertheless, *Bornstein* does suggest that the baseline for determining the government's "original loss" should be the government's "actual damages," although that decision is not otherwise illuminating on how "actual damages" should be determined in this case. *Bornstein,* 423 U.S. at 316 & n. 13, 96 S.Ct. 523.[2] On the other hand, this court notes that the Supreme Court provided more general guidance on the determination of actual damages three decades before the decision in *Bornstein,* in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), when the Court observed that the motivating purpose for the FCA was "restitution to the government of money taken from it by fraud." *Marcus,* 317 U.S. at 551, 63 S.Ct. 379. In *Marcus,* the Court also observed that "the device of [then-] double damages plus a specific sum was chosen to make sure that the government would be made completely whole." *Id.* at 551–52; *see also United States ex rel. Roby v. Boeing Co.,* 302 F.3d 637, 646 (6th Cir.2002) ("FCA damages 'typically are liberally calculated to ensure that they "afford the government complete indemnity for the injuries done." ' ") (quoting *United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 304 (6th Cir.1998), in turn quoting *Marcus,* 317 U.S. at 549, 63 S.Ct. 379). This court believes that it is important to distinguish between the cal-

---

**2.** In *Bornstein,* the Court found that the government's "actual damages" should be "equal to the difference between the market value of the [goods] it received and retained and the market value that the [goods] would have had if they had been of the specified quality."

423 U.S. at 316 & n. 13, 96 S.Ct. 523. The present case, however, does not involve the value of goods received by the government, let alone goods that were not of the specified quality.

culation of "actual damages," that is, the government's "original loss," on the one hand, and the calculation of treble damages with any appropriate adjustments, on the other. The first calculation, to determine the government's "actual damages," *Bornstein,* 423 U.S. at 316 & n. 13, 96 S.Ct. 523, should be made by the jury, so that the government is first compensated for "money taken from it by fraud." *See Marcus,* 317 U.S. at 551. The second calculation, involving trebling of damages and any appropriate adjustment for sums recovered from other tortfeasors and imposition of appropriate penalties, is made by the court, *see Bornstein,* 423 U.S. at 314–17, 96 S.Ct. 523, and serves the policy purposes of the FCA to ensure that the government is "made completely whole." *Marcus,* 317 U.S. at 551–52, 63 S.Ct. 379.

From this perspective, it is apparent that the reimbursement provisions of the SRA are relevant to the jury's calculation of the government's "actual damages." *Bornstein,* 423 U.S. at 316 & n. 13, 96 S.Ct. 523. More specifically, such evidence makes it more probable that the government's "actual damages" are not the full amount of the MPCI claims paid and the premiums subsidized. *See* FED. R.EVID. 401 (defining relevant evidence); FED.R.EVID. 402 (relevant evidence is generally admissible). Rather, the "money taken from [the government] by fraud," *Marcus,* 317 U.S. at 551, 63 S.Ct. 379, is the sum that the government paid out on the fraudulent claims and the amount that it paid in premium subsidies, less the

amount of any reimbursement that the government received from NCCI and less any premiums paid by the insureds that the government retained and offset from the indemnity losses, because these offsets are pursuant to the SRA, not because the insureds turned out to be ineligible and, thus, tortfeasors. To put it another way, because these offsets are pursuant to the SRA, only the indemnity losses in excess of these offsets constituted "money taken from [the government] by fraud." *Id.*[3] The purpose of the FCA is to make the *government* "completely whole," *Marcus,* 317 U.S. at 551–52, 63 S.Ct. 379, not necessarily to make every entity injured by the fraud—which may include NCCI— "completely whole." Thus, NCCI's losses, in the form of its percentage of the indemnities that it paid to the government pursuant to the SRA, are not part of the government's "actual damages." Therefore, evidence of the reimbursement and payment provisions of the SRA are relevant to the determination of the government's "actual damages" pursuant to Rule 401 and admissible pursuant to Rule 402 of the Federal Rules of Evidence.

The government, nevertheless, takes the position that this evidence should be excluded pursuant to Rule 403 of the Federal Rules of Evidence because it is confusing. The government's position, that the "original loss" or "actual damages" calculation for the jury should not be complicated by consideration of the reimbursement and payment provisions under the SRA would

---

**3.** On the other hand, if the premiums paid by the insureds were retained by the government only because the insureds were discovered to be ineligible, and if the government otherwise recovered from the insureds sums paid to them for crop losses on the ground that they were ineligible for such payments and, therefore, tortfeasors, then the premiums retained and the sums recovered would be comparable to recovery by the government from another

tortfeasor as a result of the fraud, as in *Bornstein,* 423 U.S. at 314–17, 96 S.Ct. 523. The sums recovered from other tortfeasors would still be credits to the defendant only *after* the court trebles the government's actual damages, however. *Id.* Thus, evidence of such recoveries would not be relevant to the jury's determination of actual damages or admissible at trial before the jury in any event.

certainly simplify presentation of the government's damages claim to the jury, but it would also produce a windfall to the government in excess of the amount of the "money taken from [the government] by fraud." *Marcus,* 317 U.S. at 551, 63 S.Ct. 379. The "confusion" involved is part of what is necessary to prove the government's actual damages, not "confusion" resulting from injection of extraneous or collateral issues; thus, this is not the sort of "confusion" that warrants exclusion of the evidence pursuant to Rule 403. *See Firemen's Fund Ins. Co.,* 63 F.3d at 758 (" 'Confusion of the issues warrants exclusion of relevant evidence [pursuant to Rule 403] if admission of the evidence would lead to litigation of collateral issues.' ") (quoting *Dennis,* 625 F.2d at 796–97).

Therefore, the portion of the government's May 28, 2008, Motion In Limine seeking to exclude evidence of reimbursement and payment procedures between the FCIC and NCCI and retention by the United States of premiums paid by the insureds pursuant to the SRA will be denied.

### C. The Defendants' Motion

### 1. The evidence at issue

The court turns, next, to Hawley's May 28, 2008, Motion In Limine. In that motion, Hawley seeks to exclude the following eight categories of evidence: (1) any of the government's proof and arguments disclosed to Hawley after the close of discovery; (2) Hawley's tax returns and evidence of Hawley's income, wealth, or financial condition; (3) any reference to "experts"; (4) evidence of experts' opinions on matters that are legal issues, that involve mixed questions of fact and law, or that are nothing more than telling the jury what result to reach; (5) evidence that Russell Hawley has, on occasions other than those at issue in this case, signed the name of insureds to insurance documents;

(6) evidence of other alleged "bad acts" by Hawley; (7) hearsay statements of various witnesses secured by one or more employees or agents of the government; and (8) evidence of the "Pretrial Diversion Agreements" and memoranda or "proposed" settlement agreements with the ineligible insureds. The government resists Hawley's motion in its entirety. Therefore, the court will consider the admissibility of these categories of evidence in turn.

### 2. Evidence disclosed after the close of discovery

### a. Arguments of the parties

■ Hawley first asks the court to limit the government's proof to answers to interrogatories and requests for production provided before the close of discovery. Hawley explains that the government made timely responses to Interrogatories 2–5, 7–8, and 11–21, and Requests for Production 13–14 and 16, all included in Exhibits A and B in the Appendix to Hawley's Motion In Limine. Hawley contends that allowing the government to call witnesses not disclosed in the timely responses would constitute unfair surprise. Hawley also contends that any expert opinions and testimony should be limited to opinions and testimony consistent with the government's initial expert disclosures and timely responses to Interrogatory 3, despite the government's attempt to "supplement" its discovery responses on May 23, 2008, to include additional opinions of its experts and identifying, for the first time, a PowerPoint presentation and other reports, data, and material the substance of which was not previously disclosed. Hawley also contends that, on or about May 14, 2008, as shown in Exhibit D, the United States obtained ex parte orders securing the grand jury testimony of Edward Marshall, Donald Kluver, Mark Hoffman, and Russell Hawley, and then served the same

on Hawley's counsel. Hawley contends that, on May 23, 2008, the government served untimely supplemental responses to Hawley's interrogatories and requests for production and miscellaneous documents concerning grand jury testimony, but the disclosed transcripts and miscellaneous documents fell within the ambit of discovery requests and Rule 26 of the Federal Rules of Civil Procedure, and the government made no attempt to supplement its responses before the close of discovery, even though the transcripts and documents were in the control of the government. Finally, Hawley contends that the government should be limited in evidence and argument to the policies, procedures, statutes, ordinances, regulations, standards, facts, and contentions set forth in its timely answers to Interrogatories 7–8 and 11–21, because any additional evidence or argument would constitute unfair surprise, including documents only disclosed under a cover letter dated March 20, 2008.

In response, the government argues that it supplemented its discovery responses in a timely manner for completeness, as it has a duty to do, and that none of the information was new to the defendants. More specifically, the government argues that Leann Koch and Lee Gutknecht were previously disclosed as "persons with knowledge" in Amended Initial Disclosures provided on December 28, 2007, and on May 23, 2008, and the government merely supplemented its earlier responses by adding Mr. Gutknecht and Ms. Koch as persons with knowledge and potential witnesses. The government asserts that Hawley has had access to these persons, as Gutknecht is Russell Hawley's former supervisor and his friend, and Koch is a former employee now working as a licensed crop insurance agent. Thus, the government asserts that there is no "unfair surprise" in the disclosure of these persons as witnesses on May 23, 2008,

where the government has only added clarification of the information that these witnesses may provide. The government also argues that there is no "unfair surprise" in the documents that were added in supplemental responses, because Hawley had already received the NCCI Standard Reinsurance Agreement, Plan of Operations, Manual 14, and FCIC Document Standards Handbook in initial disclosures and Hawley is familiar with these documents. Thus, the government asserts that there is no "unfair surprise" in a disclosure that these documents will be used at trial. The government argues, next, that Hawley never requested that grand jury transcripts be released by the court, even though Hawley was aware of the grand jury proceedings, and the government could not have provided those transcripts without first obtaining leave of court. The government explains that it did not request release of the transcripts sooner, because some of the testimony is related to ongoing investigations. The government contends that the Supreme Court has held that the secrecy of grand jury proceedings must not be broken except where there is a compelling necessity and argues that no such necessity existed until trial in this case was imminent and witnesses would need to see their previous testimony. The government points out that it had already provided Hawley with all witness statements obtained outside of the grand jury proceedings. The government also argues that the grand jury testimony will not be offered as substantive evidence, but will be used to refresh witnesses' memories or for impeachment.

In reply, Hawley admits that LeAnn Koch was previously disclosed as a fact witness and, therefore, Hawley does not object to any supplemental disclosures that concern her role as such. Moreover, Hawley does not object to testimony by Lee

Gutknecht, to the extent that he testifies only as a fact witness, but Hawley does object to the extent that the government now seeks to introduce "opinion-like testimony" from that witness, because other expert witnesses have already been identified. As to those other experts, Hawley contends that the government is now impermissibly seeking to expand the subject matter of their testimony. Hawley contends that it determined which experts to depose based on the government's prior disclosures, so that the government should not be allowed to add to its experts' opinions at this late date. Hawley explains, further, that the government did not previously disclose a PowerPoint presentation by Mark Price that exceeds the scope of the matters addressed in his report, and Hawley had decided not to depose Price based on his report. Hawley also explains that the government has not previously disclosed that Richard Schwartzbeck would testify that he was responsible for developing the certification line for agents on the crop applications and acreage reports or that he will, presumably, discuss that certification line. Hawley also contends that the government has provided no good reason why it did not secure and produce the grand jury testimony prior to the close of discovery, because the two cases involved in the government's supposed "ongoing investigation" were finished prior to this case. Hawley also contends that the government admits that it is trying to "lock in" statements previously given by the witnesses to USDA agents, thereby acknowledging that the prior statements are hearsay, and that the grand jury testimony was obtained without benefit of cross-examination. Thus, Hawley contends that the government has waited to produce sworn grand jury testimony until after discovery has closed, which Hawley argues is behavior that the court should not reward.

### b. *Analysis*

■ The court "'start[s] with the premise that a district court may exclude from evidence at trial any matter which was not properly disclosed in compliance with the Court's pretrial order.'" *Life Plus Int'l v. Brown*, 317 F.3d 799, 803 (8th Cir.2003) (quoting *Dabney v. Montgomery Ward & Co.*, 692 F.2d 49, 51 (8th Cir.1982), with internal quotations omitted, *cert. denied*, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983)). However, when a party fails to make a timely disclosure of evidence, for example, by failing to provide information or identify a witness in compliance with Rule 26(a) or (e) of the Federal Rules of Civil Procedure, "the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson*, 527 F.3d 687, 691–92 (8th Cir.2008). As the Eighth Circuit Court of Appeals just recently explained,

> The district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless. Fed.R.Civ.P. 37(c)(1). When fashioning a remedy, the district court should consider, inter alia, the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony. *Sellers v. Mineta*, 350 F.3d 706, 711–12 (8th Cir.2003); *see also Marti v. City of Maplewood*, 57 F.3d 680, 683 (8th Cir. 1995) (setting forth a variety of possibly relevant factors).

*Wegener*, at 691–92. The court has noted, however, "that the district court's discretion narrows as the severity of the sanction or remedy it elects increases." *Id.* at 692–

93. The court concludes that Hawley has not been unfairly surprised by any of the purportedly belated supplementation of the government's discovery responses, even if they are technically untimely, and that, where disclosure might be technically untimely, the government has offered substantial reason for noncompliance.

More specifically, as to expert witnesses, Rule 26(e)(2) of the Federal Rules of Civil Procedure provides that a party has a duty to supplement both information included in an expert's report and information given during the expert's deposition and, of more interest here, provides that "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." FED.R.CIV.P. 26(e); *see also Wegener*, at 690–91 (the timeliness of supplemental expert disclosures is controlled by Rule 26(e)). Rule 26(a)(3) provides, in turn, that, "[u]nless the court orders otherwise, these [pretrial] disclosures must be made at least 30 days before trial." FED. R.CIV.P. 26(a)(3). Hawley does not assert, and the court does not find, that any earlier deadline is applicable pursuant to a court order. The court finds that the challenged supplemental expert disclosures were made on or before May 28, 2008, more than thirty days before trial is scheduled to begin on June 30, 2008. Therefore, the government's supplementation of its expert disclosures more than thirty days before trial was timely. *Id.*

The government's May 22, 2008, supplemental response to discovery requests provides the following updated information about Lee Gutknecht's anticipated testimony, which Hawley argues suggests that he will give "opinion-like" testimony:

This individual [previously identified only as "[i]ndividuals from entity f/k/a NCCI] is Lee Gutknecht previously disclosed in Amended Disclosure. Gut-

knecht has knowledge of defendants' training; and in the area of compliance; Gutknecht is also knolwedgeably [sic] in the SRA and Guidelines and Expectations for delivery of federal crop insurance program (Manual 14), the Policies and procedures set out in the CRC policy, Crop Insurance Handbook and NCCI Agent Manual."

Defendants' Appendix (docket no. 34–8), 70. Based on this disclosure, the court can only speculate as to what "opinion-like" testimony Hawley fears will be elicited from Mr. Gutknecht. Nevertheless, the court observes that, to the extent that Mr. Gutknecht's testimony involves opinions based on scientific, technical, or other specialized knowledge, rather than first hand personal knowledge, it would trespass into the zone of "expert" testimony for which he has not been designated. *See* FED. R.EVID. 602 (stating the personal knowledge requirement); 702 (permitting lay opinions where, *inter alia*, they are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); 702 (permitting opinion testimony by persons qualified as experts). However, to the extent that his opinions comply with Rule 701 of the Federal Rules of Evidence, they may be permissible lay opinions. *See* FED.R.EVID. 701 (opinions of witnesses not testifying as experts are permissible if they are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). Hawley has not demonstrated that Mr. Gutknecht's testimony must be excluded as improper opinion testimony.

As to other witnesses and documents, the court also finds no unfair surprise in the timing of the government's supplemen-

tal disclosures, even supposing the disclosures to be untimely. It appears that all such witnesses and documents were either already known to Hawley from the government's timely disclosures and discovery responses, or were disclosed sufficiently in advance of trial that Hawley has had a fair opportunity to review the documents or the witnesses' likely testimony and to prepare to address them. Thus, Hawley is not prejudiced, nor will allowing the information or testimony disrupt the order and efficiency of the trial. *Wegener,* at 691–92 (in considering a sanction for untimely disclosure, the court must consider, *inter alia,* "the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony").

As to grand jury testimony, the court's analysis is slightly different, but the conclusion is ultimately the same. The court finds, in the first instance, that the timing of the government's disclosure is substantially justified. *Id.* (the court must also consider the reason for noncompliance). The government is correct that Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure permits a court to authorize disclosure of grand jury proceedings "preliminarily to or in conjunction with a judicial proceeding." However, to obtain such disclosure, the party seeking disclosure must show "particularized need" for the materials and the court must consider "the extent of the need for continuing grand jury secrecy." *McAninch v. Wintermute,* 491 F.3d 759, 767 (8th Cir.2007) (so summarizing the requirements more specifically identified as "the extent of the need for continuing grand jury secrecy, the need for disclosure, and the extent to which the request was limited to that material directly pertinent to the need for disclosure"). Here, the government has shown

that it did not seek disclosure of grand jury testimony sooner, because there was still a need to maintain secrecy of the grand jury proceedings owing to ongoing investigations. *Id.* (recognizing this factor as pertinent to deciding whether grand jury testimony should be disclosed). The government is also correct that Hawley was aware of the grand jury proceedings, because Russell Hawley had been called as a witness in such proceedings, and Hawley could have petitioned the court for earlier disclosure of the grand jury testimony. Although Hawley contends that the two cases in which "ongoing investigations" were supposedly in progress ended before this case, Hawley has not shown that those cases ended substantially before the government sought permission to disclose the grand jury testimony or, indeed, that those are the only two cases in which the government had "ongoing investigations" to which the grand jury testimony pertained.

Even assuming that the disclosure of the grand jury testimony is "untimely," in relation to the conclusion of the other cases in which "ongoing investigations" were supposedly occurring, Hawley admits that the government obtained ex parte orders for disclosure of grand jury testimony on May 14, 2008, and actually served supplemental responses to Hawley's interrogatories and requests for production and miscellaneous documents concerning grand jury testimony on May 23, 2008, more than thirty days before the trial set to begin on June 30, 2008. Thus, the disclosure of the grand jury testimony complied with Rule 26(a)(3)(B), concerning pre-trial supplementation of discovery responses, if the transcripts of that testimony are intended as substantive evidence. The court notes that the government also argues that the grand jury testimony will not be offered as substantive evidence, but will be used to

refresh witnesses' memories or for impeachment. Thus, the supplementation requirement of Rule 26(a)(3) may not apply at all, and disclosure of the grand jury testimony may actually have been more than was required. *See* Fed.R.Civ.P. 26(a)(3)(A) (supplementation is only required for evidence that may be presented at trial "other than solely for impeachment").

Consequently, the court finds that the timing of the government's disclosure of grand jury testimony is substantially justified and that such evidence is not subject to exclusion on the basis of untimely disclosure. *Wegener*, at 691–92 (the court must consider the reasons for untimely disclosure).

Therefore, this portion of Hawley's Motion In Limine will be denied.

### 3. Hawley's tax returns and other financial information

#### a. Arguments of the parties

■ Next, Hawley seeks to exclude evidence of his tax returns and other evidence of both the individual defendant's and the corporate defendant's financial condition, income, and net worth on the ground that such evidence is irrelevant under Rule 401 of the Federal Rules of Evidence, because nothing about such evidence tends to prove any elements of the government's case or to disprove any defense Hawley may tender. Assuming, for the sake of argument, that such evidence is relevant, Hawley contends that it should nevertheless be excluded pursuant to Rule 403, because any probative value of such evidence is substantially outweighed by the danger of unfair prejudice. Hawley acknowledges that the commissions that the defendants earned may be relevant, but their overall income and wealth are not. Hawley argues that such income and wealth evidence may also cause the jury to punish Hawley for making money and accumulating wealth or consider Hawley's ability to pay as the basis for determining damages, if any.

The government argues that such evidence is relevant and not prejudicial. Specifically, the government argues that evidence of the commissions that Hawley made from sales of MPCI policies to Kluver, the Hoffmans, Marshall, and the Winquists is relevant in proving Hawley's motive to submit a false claim, as well as recklessness. The government contends that evidence of Hawley's wealth or income is relevant to the same issues, because income is relevant to showing that Hawley was highly compensated for what Russell Hawley described in his deposition as "filling out paperwork." The government also argues that any potential prejudice can be eliminated by an instruction limiting the use of such evidence. The government argues, in the alternative, that Hawley's motion to exclude this evidence is premature, because such evidence may become relevant in the course of trial.

In reply, Hawley argues that the government has admitted that the real reason for offering evidence of Hawley's income and wealth is to show that Hawley was "highly compensated" for filling out paperwork. Hawley argues, however, that the fact that he was highly compensated for his work is irrelevant and prejudicial. Hawley also argues that the government has not shown how all of this evidence shows motive and recklessness. Hawley admits that evidence of his commissions might be relevant to show motive and recklessness, but evidence of his income and wealth is not, because it would prove, if anything, lack of motive, because it raises the question of why Hawley would risk such a highly compensated career and accumulating wealth for one or two ineligible

insureds. Hawley also argues that the government's argument that determination of the admissibility of this evidence is premature is unpersuasive, where this trial is scheduled for four days, not several weeks.

#### b. Analysis

Hawley seeks exclusion of this evidence on relevance grounds, pursuant to Rule 401, and on prejudice grounds, pursuant to Rule 403. The Eighth Circuit Court of Appeals has recently explained "prejudice" within the meaning of Rule 403 as follows:

> Under Rule 403, district courts have broad discretion to assess unfair prejudice, and are reversed only for an abuse of discretion. *United States v. Henderson,* 416 F.3d 686, 693 (8th Cir. 2005), *cert. denied,* 546 U.S. 1175, 126 S.Ct. 1343, 164 L.Ed.2d 57 (2006). Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis." *Wade v. Haynes,* 663 F.2d 778, 783 (8th Cir.1981), *aff'd sub nom. Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

*United States v. Myers,* 503 F.3d 676, 681 (8th Cir.2007); *United States v. Farrington,* 499 F.3d 854, 858–59 (8th Cir.2007). The Advisory Committee Notes to Rule 403 explain that a decision on an "improper basis" is "commonly, though not necessarily, an emotional one." FED.R.EVID. 403, Advisory Committee Notes; *see also United States v. Jiminez,* 487 F.3d 1140, 1145 (8th Cir.2007) (quoting this note); *United States v. Dierling,* 131 F.3d 722, 730–31 (8th Cir.1997) (considering whether evidence was unfairly prejudicial, because it might lead to a decision on an improper basis, where it purportedly had no connection to the charged offense and

revealed grisly or violent behavior that made the defendant appear "dangerous"). Unfairly prejudicial evidence has also been described as evidence that is " 'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.' " *United States v. Adams,* 401 F.3d 886, 900 (8th Cir.2005) (quoting *United States v. Shoffner,* 71 F.3d 1429, 1433 (8th Cir.1995)). The Advisory Committee's Notes to Rule 403 also explain that a determination on unfair prejudice should include consideration of the possible effectiveness or lack of effectiveness of a limiting instruction. FED.R.EVID. 403, Advisory Committee Notes; *see also United States v. Hawthorne,* 235 F.3d 400, 404 (8th Cir.2000) (finding that relevance of evidence was not outweighed by any potential prejudice within the meaning of either Rule 404(b) or Rule 403 where the evidence was used for a limited purpose and the district court gave a limiting instruction).

More specifically, evidence of a defendant's financial condition and income may be relevant to the defendant's motive for a fraudulent scheme, *see, e.g., United States v. Wainright,* 351 F.3d 816, 821 (8th Cir. 2003), but it also has some potential for unfair prejudice. For example, as the government asserts, in *United States v. Quattrone,* 441 F.3d 153 (2d Cir.2006), the Second Circuit Court of Appeals found that the district court had not abused its discretion in admitting evidence of the defendant's "substantial salary" during two years to establish a motive for the defendant to obstruct IPO allocation investigations over the defendant's contention that the evidence was irrelevant and unduly prejudicial, in that it invited the jury to engage in class-based bias against him. *Quattrone,* 441 F.3d at 187. In affirming the lower court, the Second Circuit Court of Appeals observed, "While evidence of compensation, wealth, or lack thereof can

unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth." *Id.* The court found no undue prejudice in that case, because the government's references to the defendant's compensation during its opening statement and summation specified that evidence of his compensation was to be used for the limited purpose of establishing a motive to obstruct and could not be used to convict the defendant simply because of his wealth. *Id.; see also* FED.R.EVID. 403, Advisory Committee Notes (a determination on unfair prejudice should include consideration of the possible effectiveness or lack of effectiveness of a limiting instruction); *accord Hawthorne,* 235 F.3d at 404 (finding that relevance of evidence was not outweighed by any potential prejudice within the meaning of either Rule 404(b) or Rule 403 where the evidence was used for a limited purpose and the district court gave a limiting instruction).

It would certainly be improper for the government to argue or suggest that anyone who is paid on a commission necessarily has a motive to engage in fraudulent schemes to increase his or her commissions. Nevertheless, the court has little hesitation in concluding that evidence of the amount of compensation that Hawley received for writing the allegedly fraudulent MPCI policies at issue in this case is relevant to show his motive to write fraudulent policies, and that such evidence is not unduly prejudicial. *Cf. Quattrone,* 441 F.3d at 187 (evidence of the defendant's "substantial salary" in two years during which he allegedly obstructed an IPO allocation investigation was relevant to show his motive and not unduly prejudicial). Hawley concedes that evidence of his commissions is relevant.

More general evidence of Hawley's income and financial condition, on the other hand, has less probative value and greater potential for undue prejudice, as it has a greater tendency to invite the jury to find against him because of his wealth or because the jury believes that he is overpaid for "filling out paperwork." *Id.* (recognizing that "evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations"). However, Hawley's contention that evidence of his income and wealth does *not* show motive or recklessness, because such evidence shows that he would not risk his income or wealth for one or two ineligible insureds, *i.e.,* that it is less probable that he had a motive to engage in fraudulent activity, simply demonstrates the relevance of the evidence. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence." FED.R.EVID. 401 (emphasis added).

Moreover, in the court's view, any potential for undue prejudice from the financial evidence could be limited by an appropriate limiting instruction that such evidence may be considered by the jury only in its determination of Hawley's motive to engage in fraudulent activity or recklessness as to the possibility of fraud, and not to find against him simply because of his wealth or because the jury may believe he is overcompensated for the work he does. *Cf. Quattrone,* 441 F.3d at 187 (finding that the government had reminded the jurors to use similar evidence for the limited purpose of determining motive); *Hawthorne,* 235 F.3d at 404 (finding that relevance of evidence was not outweighed by any potential prejudice within the meaning of either Rule 404(b) or Rule 403 where the evidence was used for a limited purpose and the

district court gave a limiting instruction); Fed.R.Evid. 403, Advisory Committee Notes (explaining that a determination on unfair prejudice should include consideration of the possible effectiveness or lack of effectiveness of a limiting instruction).

Therefore, the portion of Hawley's Motion In Limine seeking to exclude evidence of his tax returns and other evidence of both the individual defendant's and the corporate defendant's financial condition, income, and net worth will be denied.

#### 4. References to "experts"

##### a. Arguments of the parties

■ Relying on an article, proposed order, and proposed jury instruction by Hon. Charles Richey, United States District Judge for the District of Columbia, Hawley argues that the court should prohibit the use of the term "expert" by the parties and the court. Hawley argues that such a prohibition is appropriate to ensure that the court does not inadvertently put its stamp of authority on the opinion of a witness and to protect the jury from being overwhelmed by so-called "experts." In short, Hawley argues that such a prohibition is necessary to prevent "expert" testimony from becoming unduly prejudicial before jurors. Hawley also proposes an order and limiting instruction used by Judge Richey to avoid unfair prejudice.

The government argues that Eighth Circuit Model Criminal Instruction No. 4.10 plainly contemplates that the court and the parties may identify certain witnesses as "experts." The government also argues that this instruction advises the jurors that they may accept or reject expert testimony and give it any weight that they think it deserves. Thus, the government argues that this instruction is adequate to ensure that jurors do not give undue weight to testimony that has been labeled "expert." Avoiding use of the term "experts," the government suggests, would be needlessly confusing and complicated. In the alternative, the government suggests that the court may refrain from referring to witnesses as "experts," but should not prohibit the parties from doing so. The government argues that the parties are, in essence, arguing that their witnesses are qualified to give expert testimony.

In reply, Hawley argues that Judge Richey's rationale for a limiting instruction applies, even if exclusion of the term "expert" is not ordinarily done in the Eighth Circuit. Hawley also argues that, contrary to the government's contentions, Judge Richey has identified an alternative description of such witnesses as "opinion witnesses."

##### b. Analysis

The court has reviewed Judge Richey's article, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" under the Federal Rules of Evidence in Civil and Criminal Trials*, 154 F.R.D. 537 (July 1994), cited by Hawley in support of his argument that the court should prohibit references to "experts." The court finds that Judge Richey has also put his thoughts into practice, for example, in *United States v. Thomas*, 797 F.Supp. 19 (D.D.C.1992), in which he prohibited anyone from referring to a witness as an "expert," because he "believe[d] that using the term 'expert' may encourage a jury to give the witness' testimony more weight than it is fairly entitled to receive." *Thomas*, 797 F.Supp. at 24. Although Judge Richey acknowledged that Rules 702 and 703 of the Federal Rules of Evidence do not preclude use of the term "expert," "the rules make clear that the purpose of the testimony is to allow a witness with specialized knowledge to state an opinion," so that referring to the wit-

ness as an "opinion witness" "explained the purpose of the testimony to the jury in a manner more consonant with the interests of justice...." *Id.* Moreover, Judge Richey gave an instruction as to how the jurors should consider the testimony of opinion witnesses, and explained that this limiting instruction and avoidance of the term "expert" were "designed to dispel any possible prejudice [the witness's] testimony might have engendered." *Id.* at 25; *see also United States v. Mitchell,* 796 F.Supp. 13, 20 (D.D.C.1992) (taking the same approach).[4]

The court has also reviewed Judge Richey's proposed order prohibiting counsel from using the word "expert" and, instead, directing counsel to refer to such persons as "opinion" witnesses, *see* Defendants' Exhibit G, as well as his proposed jury instruction on "opinion witness testimony." *See* Defendants' Exhibit H. Judge Richey's proposed jury instruction is as follows:

> Ladies and Gentlemen, please note that the Rules of Evidence ordinarily do not permit witnesses to testify as to their opinions and conclusions. Two exceptions to this rule exist. The first exception allows an ordinary citizen to give his or her opinion as to matters that he or she observed or of which he or she has first hand knowledge. The second exception allows witnesses who, by education, training and experience, have acquired a certain specialized knowledge of some art, science, profession or calling, to state an opinion as to relevant material matters.

> The purpose of opinion witness testimony is to assist you in understanding the evidence and deciding the facts in this case. You are not bound by this testimony and, in weighing it, you may consider his or her qualifications, opinions and reasons for testifying, as well as all other considerations that apply when you evaluate the credibility of any witness. In other words, you should give it such weight as you think it fairly deserves and consider it in light of all the evidence in this case.

Defendants' Exhibit H; *see also Thomas,* 797 F.Supp. at 21–22 (using a similar instruction).

Although this court acknowledges that Judge Richey's concerns about use of the term "expert" have some foundation, this court nevertheless does not believe that it is necessary to prohibit use of the term "expert" to avoid "encourag[ing] a jury to give the witness' testimony more weight than it is fairly entitled to receive." *Contra Thomas,* 797 F.Supp. at 24. Rather, such potential prejudice can be avoided by instructing jurors on the way in which they are to determine what weight to give to a purported "expert's" opinion. *See* FED.R.EVID. 403, Advisory Committee Notes (explaining that a determination on unfair prejudice should include consideration of the possible effectiveness or lack of effectiveness of a limiting instruction). Specifically, jurors should be instructed to consider the manner in which an "expert" becomes qualified to give an opinion on matters within the witness's field; that

---

4. In *Gifford v. Vail Resorts, Inc.,* 37 Fed.Appx. 486 (10th Cir.2002), the Tenth Circuit Court of Appeals considered the opposite concern, that the district court constructively excluded the plaintiff's expert's testimony and thereby misled the jury by prohibiting the plaintiff from referring to that witness as an "expert" or to his opinions as "expert opinions." *Gifford,* 37 Fed.Appx. at 492. *Id.* The Tenth Circuit Court of Appeals found that the district court had referred to "experts" and the opinions they may give in its jury instructions and then permitted the witness to give his opinions based on his investigation, so that the jury was adequately advised of both the nature and substance of the witness's testimony, and the plaintiff was not prejudiced. *Id.*

the jurors are to decide what weight to give the witness's testimony based on the witness's qualifications and the reasons and methods used to reach an opinion; that jurors are to consider the testimony of such witnesses just like the testimony of any other witnesses; and that jurors may ultimately give the opinions of expert witnesses whatever weight the jurors deem appropriate. *See, e.g., United States v. Cerone,* 830 F.2d 938, 951 (8th Cir.1987) (finding no error where "the district court instructed the jury that expert testimony should be considered just like any other testimony and be given whatever weight the jury finds appropriate in light of the expert's qualifications and all the other evidence"); *Spears v. Hough,* 458 F.2d 529, 531 (8th Cir.1972) ("The trial court properly instructed the jury that they were not bound by the opinions given by the experts, and could give those opinions the weight, if any, to which they deemed them entitled."); *see also* FED. R.EVID. 702 (expert testimony is admissible if it is "based upon sufficient facts or data," "is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of the case").

The court finds that Eighth Circuit Model Criminal Instruction No. 4.10 addresses the appropriate matters to advise the jurors how to treat so-called "expert" testimony, as follows:

You have heard testimony from persons described as experts. Persons who, by knowledge, skill, training, education or experience, have become expert in some field may state their opinions on matters in that field and may also state the reasons for their opinion.

Expert testimony should be considered just like any other testimony. You may accept or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, the acceptability of the methods used, and all the other evidence in the case.

This court recognizes, however, that the "expert" status of such witnesses and the "expert" nature of their testimony may be appropriately de-emphasized by eliminating unnecessary references to "experts" and "expert testimony" and/or by identifying such persons as "expert witnesses," rather than simply as "experts," so that it is more apparent that the weight to be given to their testimony, just like the weight to be given to any other witnesses' testimony, is a matter for the jurors to decide. The court also believes that it is beneficial to contrast "expert" witnesses and lay witnesses with regard to their ability, in general, to offer opinions instead of to testify only about matters in their personal knowledge. *Compare* FED. R.EVID. 702 (testimony by experts may include opinions), *with* FED.R.EVID. 602 (generally, a witness may only testify to a matter if the witness has personal knowledge of the matter).[5] Furthermore, the court believes it is appropriate to point out that, just like any other witness, an "expert" may be impeached for bias. With these thoughts in mind, this court will modify this Circuit's Model Jury Instruction on "experts" as shown below in a side-

---

**5.** Although "lay opinions" are also admissible, in certain circumstances, as provided by Rule 701, this court has found instances in which "lay opinions" were offered and admitted to be quite rare, while instances in which "expert opinions" have been offered and admitted have been anything but rare. Thus, the court finds it unnecessary, in the ordinary case, to inform jurors about "lay opinions." The court notes, however, the irony of the possibility that Mr. Gutknecht may be permitted to offer "lay opinions" in this case, as explained above in reference to purported untimely disclosure of witnesses.

by-side presentation, with points of comparison shown in italics, and with certain other stylistic modifications that the court has incorporated into its own "stock" version:

| Eighth Circuit Model Criminal Jury Instruction No. 4.10: | Court's Modified Version: |
|---|---|
| You have heard testimony from persons described as experts. Persons who, by knowledge, skill, training, education or experience, have become expert in some field may state their opinions on matters in that field and may also state the reasons for their opinion.<br>*Expert testimony* should be considered just like any other testimony. You may accept or reject it, and give it as much weight as you think it deserves, considering the witness's *education and experience,* the soundness of the reasons given for the opinion, the acceptability of the methods used, and all the other evidence in the case. | *Ordinarily, witnesses may only testify to factual matters within their personal knowledge.* However, you have heard/may hear evidence from persons described as experts. Persons may become qualified as experts in some field by knowledge, skill, training, education, or experience. Such *witnesses* may state their opinions on matters in that field and may also state the reasons for their opinions. You should consider *such testimony* just like any other testimony. You may believe all of what an expert *witness* says, only part of it, or none of it, considering the witness's *qualifications,* the soundness of the reasons given for the opinion, the acceptability of the methods used, *any reason that the witness may be biased,* and all of the other evidence in the case. |

Therefore, the court will grant the part of the defendants' motion seeking to eliminate references to "experts," but only to the extent that the court will use the modified instruction shown above. Neither the court nor the parties will be prohibited from using the term "expert," however.

### 5. Expert opinions on legal issues and results to reach

#### a. Arguments of the parties

Next, Hawley seeks to exclude evidence of experts' opinions on matters that are legal issues, that involve mixed questions of fact and law, or that are nothing more than telling the jury what result to reach. Hawley contends that the government intends to offer such evidence in relation to his duties as an agent, the alleged existence of and his alleged involvement in a conspiracy, the interpretation or construction of certain contracts, rules, and procedures, and the nature and extent of insurable interests. He argues that such evidence should be excluded as improper

"expert" evidence under Rules 701 and 702 and as prejudicial under Rule 403. Hawley argues that the existence of a legal duty and the determination of contractual duties are questions of law for the court. Hawley also argues that the existence of a conspiracy is a mixed question of fact and law and requires an understanding of the legal elements of a conspiracy. Hawley argues, however, that none of the government's experts have the requisite legal background to offer opinions that turn, in whole or in part, on legal grounds. Hawley also argues that telling the fact finder what result to reach is simply improper, and that it is also improper for a witness to give an opinion as to whether or not a party met a legal standard.

In response, the government argues that Rule 704(a) expressly abolished the common-law "ultimate issue" rule and, instead, states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an

ultimate issue to be decided by the trier of fact." The government contends that such opinions do not invade the province of the jury, because the jury is not required to accept the opinion of the expert. The government also asserts that case law demonstrates that opinions on ultimate issues are proper, so long as the expert explains the reasons for the expert's opinion. The government also notes that courts have permitted experts to express opinions using legal terms. The government also argues that, although one of its experts, Mr. Dugan, has admitted that he is not an expert in the law, he does have sufficient experience in the insurance industry to express opinions about good insurance practices. Thus, the government argues that the testimony of this expert meets the standards for admissibility of expert opinions.

In reply, Hawley argues that using legal terms is quite different from rendering a legal opinion or telling the jury what the law is. Those issues, Hawley argues, belong to the court alone. Hawley also argues that the government's experts lack the foundation to render legal opinions.

### b. Analysis

Rule 702 of the Federal Rules of Evidence provides for expert testimony, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702. Rule 704(a) expressly permits an expert to state an opinion on an "ultimate issue," as follows:

> (a) Except as provided in subdivision (b) [pertaining to a criminal defendant's mental state], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

FED.R.EVID. 704(a). The Eighth Circuit Court of Appeals has explained the interplay of these rules:

> Under Rule 702, a qualified expert may give opinion testimony if the expert's specialized knowledge would help the jury understand the evidence or decide a fact in issue. *United States v. Arenal,* 768 F.2d 263, 269 (8th Cir.1985). Although an expert opinion is not inadmissible merely "because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Evid. 704(a), not all expert opinions are admissible. *Arenal,* 768 F.2d at 269. Opinions that are "phrased in terms of inadequately explored legal criteria" or that "merely tell the jury what result to reach" are not deemed helpful to the jury, Fed.R.Evid. 704 advisory committee's note, and thus, are not admissible under Rule 702.

*United States v. Whitted,* 11 F.3d 782, 785 (8th Cir.1993); *accord Dow Corning Corp. v. Safety Nat'l Cas. Corp.,* 335 F.3d 742, 751 (8th Cir.2003) (affirming the trial court's rejection of an expert's legal opinions that "attempt[ed] to tell the court [as the trier of fact] what result to reach," citing Rule 702 and *Whitted,* 11 F.3d at 785).

Thus, a court may properly exclude an expert's proffered testimony if it amounts to instructing the jury on the law, because instruction on the law is the function of the court. *See United States v. Wells,* 63 F.3d 745, 753 (8th Cir.1995),

*rev'd on other grounds,* 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). For example, the court may exclude any expert testimony as to a party's duty under a contract, because a party's duty is a question of law for the court, although the expert may be permitted to testify as to the ordinary business practices of those engaged in business pursuant to similar contracts. *See The Shaw Group, Inc. v. Marcum,* 516 F.3d 1061, 1068 (8th Cir. 2008). To put it another way, an expert may be allowed to testify as to a fact-based opinion, but not to state legal conclusions. *Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir.1995). Thus, an expert may testify that factual circumstances demonstrate that a person did not meet a legal duty that is otherwise defined by the court. *See, e.g., Alumbaugh v. Union Pac. R. Co.,* 322 F.3d 520, 525 (8th Cir.2003) (an expert could properly testify, without invading the province of the jury, that a crossing was not in a state of good repair because its components were not maintained properly and were badly deteriorated, even though this testimony embraced the ultimate factual issue for the jury to determine).

With these standards in mind, the court has reviewed Defendants' Exhibits I through O, which are the government's experts' reports, and Exhibit P, which is the government's July 2, 2007, designation of experts. The court finds, from these reports and designation, that several opinions that are to be offered by the government's experts are objectionable, while others are not.

■ Specifically, the government's designation for Dr. Richard Schwarzbeck, as set out in Exhibit P, ¶ 2, indicates that Dr. Schwarzbeck "will testify to proper policies and procedures." As shown in his report, Exhibit I, Dr. Schwarzbeck purports to define fiduciary duty and agency, to state that an agent has various duties without indicating the source of any such duties, and to define an "insured" or "applicant." Definitions of legal terms and duties, however, are matters that belong to the court, so that opinions on such matters will be excluded. *See Wells,* 63 F.3d at 753 (instruction on the law is a function of the court, not an expert). On the other hand, to the extent that Dr. Schwarzbeck testifies as to whether Hawley's conduct met the applicable duties as defined by the court, and indicates the reasons for such an opinion, and other fact-based opinions, rather than simply telling the jury what result to reach, his testimony will be admissible. *See Alumbaugh,* 322 F.3d at 525 (an expert could properly testify, without invading the province of the jury, that a duty defined by the court was or was not met, even if the testimony embraced the ultimate factual issue for the jury to determine); *and compare Dow Corning Corp.,* 335 F.3d at 751 (the court may exclude opinions that attempt to tell the court [as the trier of fact] what result to reach); *Whitted,* 11 F.3d at 785 (an expert may not "merely tell the jury what result to reach"); *Peterson,* 60 F.3d at 475 (an expert may state fact-based opinions, but not state legal conclusions). Also, to the extent that Dr. Schwarzbeck's testimony concerning "proper policies and procedures" is limited to ordinary business practices of those engaged in the business in question, pursuant to the applicable policies and defined procedures, such testimony is also admissible. *Cf. The Shaw Group, Inc.,* 516 F.3d at 1068 (permitting similar testimony concerning contractual duties).

The government has designated Mark Price to testify "in regard to the false claims made in this case" and to "identify approved crop insurance policies and procedures and their applications." Exhibit P, ¶ 3. Mr. Price's opinions appear to be

summarized in two parts of his report, Exhibit J. First, as to crop year 2000, Mr. Price reports,

> In my opinion, the fact that Donald Kluver met with Russell Hawley and later directed Sydney Winquist, his hired hand, to have Russell Hawley hand the MPCI policies establishes that Russell Hawley had general knowledge of the farming operation in Tripp and Mellette Counties, SD, for crop year 2000. Also, the fact that the majority of the MPCI documents on file at the Hawley Insurance Agency were not signed by Sydney or Stanley Winquist is evidence that Russell Hawley conspired with Donald Kluver to defraud the RMA/FCIC by falsely reporting the crop share, and forging signatures on crop insurance policy documents. Further, it is my opinion that Sydney and Stanley Winquist were not the true owners of the soybean crop planted in Tripp and Mellette Counties, SD. Therefore, no premium subsidies and indemnity payments were due on the MPCI policies issued in Sydney and Stanley Winquist['s] names for crop year 2000.

Exhibit J, at 5. Second, as to crop year 2001, Mr. Price opines that certain evidence "supports the statements and admissions made by Edward Marshall that he did not in fact sign his MPCI application for crop year 2001"; "that Hoffman and Russell Hawley conspired to submit false documents to NCCI by forging Edward Marshall's signature on a MPCI Application" and, moreover, that the policy in question is "invalid because the applicant's signature was forged and/or not signed by a person with authority to enter into a binding contract," so that no premium subsidy or indemnity payments should have been made; that certain records dated after the deadline for 2001 crop insurance applications show "that Russell Hawley continued to conspire with Mark Hoffman

because the Hawley Insurance Agency had already submitted an MPCI application in Edward Marhall's name for MPCI coverage . . . for crop year 2001"; and that "[t]he submission of the hail policies for Mark and Sue Hoffman by Russell Hawley is further proof that he knew or should have known that there were ineligibility problems on the land in South Dakota because the MPCI and crop-hail policies were issued to different entities." Exhibit J, at 6.

■ The court finds some of Mr. Price's likely "expert" opinions, as defined in his report, to be problematic for at least two reasons. First, once Mr. Price has "identif[ied] approved crop insurance policies and procedures," which may require specialized knowledge, and thus be admissible, *see* FED.R.EVID. 702 (an expert may testify on matters that require, *inter alia,* "specialized knowledge"), as indicated in the government's designation of experts, Exhibit P, ¶ 3, it appears that the remainder of his "opinions" are unlikely to "assist the jury." FED.R.EVID. 702. Rather, they are opinions based on inferences that the jury is capable of drawing from evidence that the jury is capable of understanding without expert assistance, not inferences that the jury could only draw with the assistance of someone with specialized knowledge. Specifically, Mr. Price's opinions about what Russell Hawley knew and whether he was engaged in or still engaged in a conspiracy are based on inferences drawn from matters of timing and circumstances that do not appear to relate to or be clarified by any of the "approved crop insurance policies or procedures" that require specialized knowledge. Second, because the opinions in question are based on evidence that the jury is capable of understanding, it appears to the court that the opinions identified will "merely tell the jury what result to reach," and as such,

are not deemed helpful to the jury. *Whitted*, 11 F.3d at 785. Therefore, Mr. Price's testimony "identify[ing] approved crop insurance policies and procedures" will not be excluded, but his testimony about what Russell Hawley apparently knew and whether or not he was engaged in a conspiracy will be excluded.

Next, the government has designated Tim Hoffman to testify "to all applicable approved FCIC policies and procedures." Exhibit P, ¶ 4. Mr. Hoffman's preliminary report, Exhibit O, indicates that he will testify that "Russ Hawley and Hawley Insurance, Inc., failed to following [sic] FCIC/RMA-approved policies and procedures," with a list of such policies. Exhibit O, at 2. The court concludes that Mr. Hoffman may testify as to approved FCIC policies, because such testimony may require specialized knowledge and be helpful to the jury. FED.R.EVID. 702. Mr. Hoffman may *not* testify as to Hawley's duty under the policies and procedures, because duty is a question for the court, but he may testify as to the ordinary business practices of those engaged in business pursuant to such policies and procedures. *Cf. The Shaw Group, Inc.*, 516 F.3d at 1068 (imposing the same limitation as to duties under a contract and ordinary business practices of those engaged in business under such a contract). He may also testify that factual circumstances demonstrate that Hawley did not meet a legal duty otherwise defined by the court, even though that opinion embraces the ultimate factual issue for the jury to determine. *Alumbaugh*, 322 F.3d at 525. So limited, Mr. Hoffman's testimony will be allowed.

The government has designated Calvin Brewer as an expert whose testimony "will include providing information about [Risk Management Agency] accounting systems and procedures" and "accounting, reimbursement, and financial oversight of fed-

erally reinsured (private) insurance companies." Exhibit P, ¶ 5. As designated, the court finds Mr. Brewer's likely testimony unobjectionable, because it does draw on specialized knowledge and is likely to be helpful to the jury to understand the matters addressed. FED.R.EVID. 702. Moreover, Hawley has not indicated, and the court has not found, where Mr. Brewer's report, Exhibit L, contains different opinions that are objectionable. Therefore, Mr. Brewer's testimony will be allowed.

Finally, the government has designated James Dugan as an expert to testify "to duties and responsibilities of a federally reinsured multi-peril crop insurance agent" and to "identify policy and procedure [sic] used to sell and service MPCI policy holders." Exhibit P, ¶ 1. In his preliminary expert report, Mr. Dugan indicates that he will testify to the following opinions: that agents are required to establish an insurable interest before completing applications and acreage reports; that the processing of a hail application indicating full ownership in a crop by one entity and accepting an application from another entity indicating full ownership of the same crop on the same land is fraud; that because Hawley accepted applications in the manner just described in 2000 and 2001, and because Kluver stated to federal agents that Hawley told him he did not want to know about the ownership of the crop, Hawley was not interested in fulfilling his duties as an agent; that Hawley had to know that certain documents were fraudulent and had to know he was committing fraud; that Hawley improperly involved himself in the loss process, based on the timing of inspections and the way claims are filed; that Hawley had improper financial involvement with his clients, indicating self-dealing and self enrichment; and that Hawley's conduct was beyond the scope of good business practice and in violation of his responsibilities to his carri-

er and the FCIC. Exhibit M. Mr. Dugan's supplemental report indicates other specific instances in which he believes that Hawley engaged in improper conduct and concludes with the opinion that "Mr. Hawley did not manage his agency in the best interest of his customers or his carriers" and that "[t]he evidence clearly shows that beyond this Mr. Hawley intentionally insured those without an insurable interest for his own enrichment." Exhibit N. As with Mr. Hoffman's expert testimony, the court concludes that Mr. Dugan may *not* testify as to Hawley's duty under the policies and procedures, because duty is a question for the court, but he may testify as to the ordinary business practices of those engaged in business pursuant to such policies and procedures. *Cf. The Shaw Group, Inc.,* 516 F.3d at 1068 (imposing the same limitation as to duties under a contract and ordinary business practices of those engaged in business under such a contract). He may also testify that factual circumstances demonstrate that Hawley did not meet a legal duty otherwise defined by the court, even though that opinion embraces the ultimate factual issue for the jury to determine. *Alumbaugh,* 322 F.3d at 525. So limited, Mr. Dugan's testimony will be allowed.

Therefore, the portion of Hawley's Motion In Limine seeking to exclude certain expert testimony will be denied in part and granted in part, as explained more fully above.

### 6. Evidence that Hawley signed the names of insureds

#### a. Arguments of the parties

Next, Hawley seeks to exclude evidence that Russell Hawley has, on occasions other than those at issue in this case, signed the name of insureds to insurance documents, even though he did not have a written power of attorney to do so. Haw-

ley argues that this evidence is irrelevant under Rules 401 and 402, is unduly prejudicial under Rule 403, and inadmissible under Rule 404. More specifically, he argues that this evidence does not have any tendency to prove the existence of any fact that is of consequence in the present dispute, and to the extent that the government intends to offer such evidence to show current conformity with past conduct, the evidence is inadmissible pursuant to Rule 404(b), and certainly does not amount to evidence of "habit" or "routine" under Rule 406. To the extent that this evidence is arguably admissible, Hawley argues that it should be excluded pursuant to Rule 403, because it will invite the jury to punish him for past "bad acts."

In its resistance, however, the government contends that evidence that Hawley forged the signatures of his insureds in the past is admissible under Rule 404(b), because it proves that Hawley had an intent to submit false claims in the present case and it establishes Hawley's motive. The government also argues that this evidence is admissible under Rule 406 as evidence of habit or routine. The government then asserts that evidence that Hawley accepted forged signatures in the past, without powers of attorney, demonstrates that he intentionally, not inadvertently, accepted bad signatures, even though Hawley did not expressly move to exclude any such evidence. The government also argues that this evidence is admissible as "habit" evidence pursuant to Rule 406, because Hawley has admitted that he accepted signatures without powers of attorney on multiple occasions.

In reply, Hawley argues that the government intends to offer evidence of alleged past forgeries to prove intent in this case, which is the very reason that prior bad acts are generally excluded under Rule 404. He also argues that the govern-

ment has failed to show that signing an insured's signature is Hawley's regular practice, routine, or habit.

### b. Analysis

The court set out above the standards for admissibility pursuant to Rules 401, 402, and 403 of the Federal Rules of Evidence. The court now adds that Rule 404(b) prohibits admission of prior convictions and "bad acts" simply to show a propensity to commit a charged offense, but does permit such evidence to be admitted for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED.R.EVID. 404(b). The Eighth Circuit Court of Appeals has explained the scope of admissibility of evidence pursuant to Rule 404(b), as follows:

> While we have interpreted Rule 404(b) to be a rule of inclusion, see United States v. Sykes, 977 F.2d 1242, 1246 (8th Cir.1992), this interpretation does not give the government the unhindered ability to introduce evidence of prior crimes. Instead, the evidence of prior crimes must be 1) relevant to a material issue; 2) similar in kind and not overly remote in time to the charged crime; 3) supported by sufficient evidence; and 4) such that its potential prejudice does not substantially outweigh its probative value. See United States v. Williams, 308 F.3d 833, 837 (8th Cir.2002).

United States v. Crenshaw, 359 F.3d 977, 998 (8th Cir.2004); accord United States v. Lakoskey, 462 F.3d 965, 979–80 (8th Cir. 2006) (reiterating that Rule 404(b) is a rule of inclusion and that evidence is admissible under Rule 404(b) if it satisfies the same four-factor test), cert. denied, —— U.S. ——, 127 S.Ct. 1388, 167 L.Ed.2d 171 (2007). Thus, the Eighth Circuit Court of Appeals will reverse admission of purported Rule 404(b) evidence " 'only when such

evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.' " United States v. Marquez, 462 F.3d 826, 830 (8th Cir.2006) (quoting United States v. Thomas, 398 F.3d 1058, 1062 (8th Cir.2005), with internal quotations omitted). However, admission of such evidence is erroneous, for example, where the record shows that the actual use that the prosecution made of the evidence did not demonstrate that the evidence was used for a permissible purpose and the court's limiting instruction failed to mention the prosecution's ostensible purpose as a basis for considering the evidence. Crenshaw, 359 F.3d at 1001–02.

In light of the government's arguments, it appears that there are two kinds of alleged "bad acts" involving signatures: (1) evidence that Russell Hawley has, on occasions other than those at issue in this case, signed the name of insureds to insurance documents, even though he did not have a written power of attorney to do so; and (2) evidence that Hawley accepted forged signatures in the past, without powers of attorney. Hawley expressly moved to exclude only the first category of evidence, but his more general attack on "bad acts" evidence, discussed in detail in the next section of this decision, was described in its brief as "including, but not limited to," certain specified kinds of misconduct. Thus, in an abundance of caution, the court will consider the admissibility of both categories of evidence.

■ *i. Hawley's forgery of signatures.* Under the circumstances presented here, the court finds consideration of the first, second, and fourth factors in the test for admissibility of "bad acts" evidence—relevance, similarity, and balance of probative value and prejudice, see Lakoskey, 462 F.3d at 979–80; Crenshaw, 359 F.3d at 998—to be dispositive of the ques-

tion of the admissibility of evidence that, in the past, Hawley allegedly forged signatures without a power of attorney. The court observes that evidence of prior instances in which Hawley signed insureds' names without a power of attorney would be relevant to whether or not he did so in this case, *if the present claims were based on allegations of forgery by Hawley,* because Rule 404(b) expressly permits use of "bad acts" evidence to show intent and motive in engaging in similar conduct. The problem is that the government's claims are not based on allegations that Hawley, himself, forged any signatures; rather, the government has only alleged that Hawley submitted documents on which Ed Marshall's signature and the signatures of the Winquists had been forged by others and that Hawley knew or should have known that the signatures were forged. The court doubts that evidence that Hawley had, himself, forged signatures in the past shows that someone else had the intent and motive to forge signatures in this case, or even that Hawley shared the intent or motive of the other forger. The court believes that such evidence, at best, has some doubtful relevance to show that Hawley *knew* the other forger had forged someone's signatures, or that he had recklessly disregarded that signatures had been forged by another, or that he conspired with that other person to forge the signatures of applicants. The government asserts that such evidence is admissible, more generally, to show that Hawley had the intent to submit false claims in the present case. The court finds, however, that the government is, in

essence, relying on the inference that a person who has engaged in forgery in the past would condone and participate in a scheme to submit documents forged by others or otherwise to perpetrate a fraud. Under the circumstances, the court finds that evidence of Hawley's alleged past forgeries of applicants' signatures sails across the line between admissible "bad acts" evidence and inadmissible mere "propensity" evidence. *See Marquez,* 462 F.3d at 830 (purported Rule 404(b) evidence should be excluded " 'only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.' ").

To put it another way, the court finds that the marginal value of evidence that Hawley forged other applicants' signatures in the past is outweighed by the potential for real and substantial prejudice, where the present claims are not based on allegations that Hawley forged any signatures. *See Lakoskey,* 462 F.3d at 979–80 (fourth factor is the balance of probative value against prejudice); *Crenshaw,* 359 F.3d at 998 (same); *see also Clark v. Martinez,* 295 F.3d 809, 814 (8th Cir.2002) (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *United States v. Mound,* 149 F.3d 799, 801–02 (8th Cir. 1998) (same), *cert. denied,* 525 U.S. 1089, 119 S.Ct. 842, 142 L.Ed.2d 697 (1999). At best, such evidence invites the jury to find against Hawley based on his alleged "bad acts" in the past. FED.R.EVID. 403, Advisory Committee Notes (explaining that a decision on an "improper basis" is "commonly, though not necessarily, an emotional one").[6]

---

**6.** As to the third factor in the Rule 404(b) analysis, sufficiency of the evidence of the prior offense, *Lakoskey,* 462 F.3d at 979–80; *Crenshaw,* 359 F.3d at 998, the court has no idea what evidence the government may have to show that Hawley forged other applicants' signatures in the past, so that the court can-

not assess whether such evidence is sufficient even to put the matter before a jury. By the same token, the court has insufficient information about the evidence of Hawley's purported past forgeries to know whether the purported instances are of such regularity and uniformity as to rise to the level of a

Therefore, evidence that Hawley, himself, purportedly forged applicants' signatures in the past will be excluded.

 **ii. Hawley's acceptance of forged signatures.** The court reaches a different result in its analysis of the admissibility of evidence that Hawley accepted forged signatures in the past, without powers of attorney. Such evidence is relevant, because it does tend to show that Hawley intentionally, not inadvertently, accepted bad signatures and that he may have had a motive or intent to file fraudulent claims in this case. *See Lakoskey*, 462 F.3d at 979–80 (the first factor in the test for admissibility of such evidence under Rule 404(b) is relevance to a material issue, see); *Crenshaw*, 359 F.3d at 998 (same); *see also* FED.R.EVID. 404(b) permitting "bad acts" evidence when admitted to show, *inter alia*, knowledge, intent, motive, and lack of mistake or accident. The court also finds that such evidence is similar in kind and apparently, based on the government's assertions, not remote in time from conduct on which the present claims are based, that is, that Hawley knowingly or recklessly accepted documents on which it appeared that the signatures of Ed Marshall and the Winquists had been forged without powers of attorney. *See id.* (the second factor is whether the prior "bad act" is "similar in kind" to the charged offense and not overly remote in time); *Crenshaw*, 359 F.3d at 998 (same). The government's

evidence of such past misconduct appears to be sufficient, where Hawley admitted such conduct in the past in his deposition. *See id.* (the third factor is sufficiency of the evidence of the prior "bad act"); *Crenshaw*, 359 F.3d at 998 (same). Finally, the balance of the probative value and the potential prejudice is quite different for this evidence, because it is considerably more probative, and the potential for prejudice can be mitigated by an instruction informing the jury of the proper uses of such "bad acts" evidence. *See id.* (the fourth factor is the balance of probative value and prejudice); *Crenshaw*, 359 F.3d at 998 (same); *see also United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir.2006) ("[A] limiting instruction [concerning proper use of evidence of a prior conviction] diminishes the danger of unfair prejudice arising from the admission of the evidence."). Therefore, evidence that Hawley has admitted accepting forged signatures in the past, without powers of attorney, will be admissible.[7]

### 7. Other "bad acts" evidence

#### a. Arguments of the parties

Next, Hawley asserts that the court should exclude other "bad acts" evidence, including, but not limited to, evidence of Hawley's alleged involvement in asset transfers by Mark, Sue, and/or Justin Hoffman and their alleged bankruptcy

"habit" within the meaning of Rule 406. *See Williams v. Security Nat'l Bank of Sioux City, Iowa*, 358 F.Supp.2d 782, 812–13 (N.D.Iowa 2005) (setting forth the standards for admissibility of evidence pursuant to Rule 406). Moreover, the "habit" is of little relevance, where conduct in conformity with the "habit" is not the basis for the present claims, and its potential for undue prejudice outweighs any such relevance.

**7.** Although the court finds that there is sufficient evidence that Hawley accepted forged

signatures in the past, even on "multiple" occasions, the court still has insufficient information about the evidence of Hawley's purported acceptance of forged signatures to know whether the purported instances are of such regularity and uniformity as to rise to the level of a "habit" within the meaning of Rule 406. *See Williams*, 358 F.Supp.2d at 812–13. Therefore, the court rests its conclusion that such evidence is admissible on Rule 404(b).

fraud, as well as the circumstances surrounding the farming of the South Dakota farmland in years other than 2000 and 2001 and the farming of land in Iowa and elsewhere in 1998 and subsequent crop years. Hawley contends that such evidence is irrelevant and that any probative value that it might have is outweighed by the potential for unfair prejudice, in the form of inviting the jury to punish Hawley for past "bad acts" instead of deciding the present case on the merits. Hawley also argues that, despite investigating the circumstances surrounding the farming of the South Dakota crop land in crop years other than 2000 and 2001 and the farming of other land, the government has only brought the claims in the present case. Hawley contends that evidence of farming in other years or on other land is potentially confusing, will delay the trial, and runs a risk of undue prejudice in the form of punishing Hawley for conduct not at issue in this case. In short, Hawley contends that introducing such evidence will generate a "trial within a trial" on collateral issues never raised in the government's pleadings.

The government argues that Hawley's involvement in asset transfers to help the Hoffmans commit bankruptcy fraud should be admissible pursuant to Rule 404(b) to demonstrate Hawley's motive to help the Hoffmans financially and, thus, his motive to submit claims for the Hoffmans' benefit in this case. The government makes no argument, however, concerning admissibility of evidence concerning the farming of the South Dakota crop land in years other than 2000 and 2001 or the farming of any other crop land.

In reply, Hawley argues that evidence of his alleged role in the Hoffmans' bankruptcy fraud to help the Hoffmans financially does not support any proof of motive in this case, because helping the Hoffmans get insurance coverage did not guarantee a claim would be paid. Thus, he reiterates that such evidence should be excluded, because of its potential for undue prejudice and because it could result in a trial within a trial.

### b. Analysis

 **i. Other crop years and other crop land.** The court agrees with Hawley that evidence of the farming of the South Dakota crop land in years other than 2000 and 2001 and the farming of other crop land in 1998 and subsequent years is inadmissible, *except to the extent that it provides the context for the relationship among the actors in this case. See, e.g., United States v. Fleck,* 413 F.3d 883, 890 (8th Cir.2005) (evidence is *res gestae* evidence if it shows the "context" of the charged offense). Even to the extent that the evidence shows the context of events at issue in this case and the relationship of the parties involved, such evidence should be carefully limited to prevent confusion of the issues, misleading the jury, undue delay, and waste of time. *See* FED.R.EVID. 403 (permitting exclusion of relevant evidence on these grounds, as well as undue prejudice). Therefore, the court will not exclude such evidence, but will rely on counsel to limit such evidence and will, itself, keep an eye on moving the case forward to relevant conduct and circumstances.

 **ii. Evidence of Hawley's involvement in bankruptcy fraud.** The court reaches a different conclusion as to evidence of Hawley's alleged involvement in asset transfers by Mark, Sue, and/or Justin Hoffman and their alleged bankruptcy fraud. The court notes that, while the government has asserted the relevance of such evidence, purportedly to show a motive in this case to help the Hoffmans financially, the government has made no

attempt to satisfy the other factors pertinent to a determination of the admissibility of evidence pursuant to Rule 404(b). *See Lakoskey,* 462 F.3d at 979–80; *Crenshaw,* 359 F.3d at 998. Assuming, for the sake of argument, that the evidence is relevant to show a motive to help the Hoffmans financially and that such a motive is, itself, relevant, *id.* (first factor), the court does not find, on the representations concerning this evidence, that the evidence involves conduct that is similar in kind—even if it is not remote in time—to the conduct at issue here. *See id.* (the second factor is whether the prior "bad act" is "similar in kind" to the charged offense and not overly remote in time); *Crenshaw,* 359 F.3d at 998 (same). The court does not accept the government's implicit contention that "fraud is fraud." Furthermore, the court has little sense of the nature and scope of the evidence of Hawley's involvement in alleged asset transfers and bankruptcy fraud, so that the court cannot adequately assess whether there is sufficient evidence of these "bad acts." *See id.* (the third factor is sufficiency of the evidence of the prior "bad act"); *Crenshaw,* 359 F.3d at 998 (same). Finally, the balance of the probative value and the potential prejudice for this evidence dictates its exclusion, because the probative value is doubtful, and the potential for prejudice is very substantial. *See id.* (the fourth factor is the balance of probative value and prejudice); *Crenshaw,* 359 F.3d at 998 (same); *see also United States v. Walker,* 470 F.3d 1271, 1275 (8th Cir.2006) ("[A] limiting instruction [concerning proper use of evidence of a prior conviction] diminishes the danger of unfair prejudice arising from the admission of the evidence."). Such evidence is inflammatory and would tend to invite a jury to punish Hawley for conduct that is not at issue in this case, instead of considering evidence of misconduct that is at issue here. *See* FED.R.EVID. 403, Advisory Committee Notes (a decision on an "improper basis" is "commonly, though not necessarily, an emotional one."); *Adams,* 401 F.3d at 900 (unfairly prejudicial evidence has been described as evidence that is "'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.'") (quoting *Shoffner,* 71 F.3d at 1433). It would also have the potential to confuse the issues and generate a trial within a trial on collateral issues of whether Hawley participated in bankruptcy fraud. FED.R.EVID. 403 (permitting exclusion of evidence with a potential to confuse the issues); *see, e.g., Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820, 834 (8th Cir.2005) (a trial court acts well within its discretion in excluding evidence pursuant to Rule 403 if such evidence would result in a "trial within a trial"). Therefore, this category of evidence will be excluded.

### 8. *Memoranda of witnesses' statements*

#### a. *Arguments of the parties*

The penultimate category of evidence that Hawley seeks to exclude is hearsay statements of various witnesses secured by one or more employees or agents of the government. Hawley contends that the government may intend to offer written memoranda or notes of witness statements or to have its experts or other witnesses testify about such statements secured by government agents or employees of the FCIC or the USDA, which are identified as Exhibits S through AL in Hawley's appendix. Hawley asserts that the written memoranda of statements are hearsay, contain double hearsay, and do not fall within a recognized exception to hearsay, such as Rule 803(8)(C) for government reports. Hawley argues that Rule 803(8)(C) applies to factual findings, not witness statements. As to double hearsay, Hawley

argues that neither level of hearsay in these statements falls within a recognized hearsay exception. Even if the statements are otherwise admissible, Hawley contends that they should be excluded, because they lack the trustworthiness required to be admissible under Rule 803(8)(C), because the statements were obtained ex parte, there is no other record of the statements, the records were not under oath or signed, and there was nothing amounting to cross-examination or other means of evaluating the credibility of the witnesses. Hawley also argues that the statements suffer from "motivational" problems, as the statements preserve a version of events prepared in anticipation of litigation. Hawley argues, next, that there is no need for the statements, where all of the pertinent witnesses can be presented "live" and can be cross-examined. Finally, Hawley argues that the statements should be excluded pursuant to Rule 403, because statements that result from ex parte investigations have little probative value and substantial potential for undue prejudice to the extent that they suggest that the agents have evaluated the ultimate factual issues. Thus, Hawley urges the court to exclude such statements and any opinions based on such statements.

The government's short response is that it has no intention of offering any of these statements as substantive exhibits to be taken to the jury room. On the other hand, the government does suggest that it may use such notes "sparingly" to revive witnesses' present recollection or to have witnesses read their past recollections into the record. The government contends that statements of past recollections are admissible pursuant to Rule 803(5). The government contends that, as long as it asks the witnesses to identify the statements, asks when they were made, and asks whether they are accurate, it has laid sufficient foundation to have the witnesses read the statements into the record. The government also contends that it is permissible to refresh a witness's memory with a memorandum recorded by someone else. The government also points out that the availability of the declarant is irrelevant to admissibility pursuant to Rule 803(5). The government also argues that the documents may be used to revive present recollections pursuant to Rule 612. The government argues that, if the witness's recollection is consistent with the writing, then it is pointless to require proof of the accuracy of the writing.

In its reply, Hawley argues that the writings are not admissible to refresh a witness's recollections or as past recollections recorded. Hawley argues that, when used to refresh a witness's memory, the writing is not itself admissible. He also argues that Rule 803(5) requires the witness to adopt the recording when the matter was fresh in the witness's memory. Here, however, the events that the witnesses discussed occurred years before they were reduced to writings by the USDA agents. Thus, the recordings were not made or adopted by the witnesses at or about the time of the events and, consequently, do not fall within Rule 803(5). Even supposing that the witnesses could now adopt the statements, Hawley argues that there is no evidence that the witnesses have done so or even that the statements were given to the witnesses. Hawley also argues that, if the statements are offered as past recollections of the USDA agents, then the notes are out-of-court statements being offered for the truth of the matters asserted and, thus, inadmissible hearsay.

#### b. Analysis

The government relies on Rules 803(5) and 612 as authorizing the admission or use of the memoranda of statements at

issue here. The court will consider separately the use or admissibility of the statements pursuant to these rules.

■ ***i. Admissibility pursuant to Rule 803(5).*** The government contends, first, that the memoranda of the witnesses' statements are *admissible* pursuant to Rule 803(5). Rule 803(5) provides an exception to the exclusion of hearsay as follows:

> **(5) Recorded recollection.** A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

FED.R.EVID. 803(5). Thus, Rule 803(5) requires that the records be made or adopted by the witness. *Id.; United States v. Benson,* 961 F.2d 707, 709 (8th Cir.1992) (excluding records because these requirements had not been met). Indeed, where the statements are not recorded verbatim and are unsigned and unsworn by the witness, they constitute inadmissible double hearsay and must be excluded. *Benson,* 961 F.2d at 709. Where such statements are admissible, however, the rule expressly provides that they may not be received as an exhibit, but may only be read into evidence. FED.R.EVID. 803(5); *United States v. Ray,* 768 F.2d 991, 994 (8th Cir.1985).

Here, the court agrees with Hawley that the statements in question have not been shown to meet the requirements for admissibility pursuant to Rule 803(5). None of the statements were recorded verbatim, none were sworn, and few were signed; [8] thus, each constitutes inadmissible double hearsay. *Benson,* 961 F.2d at 709. Even when signed, the statements were taken years after the events about which the statements were made, so that they cannot be "shown to have been made ... by the witness when the matter was fresh in the witness' memory," so that they do not fall within the hearsay exception in Rule 803(5). Thus, at least on the present showings, these memoranda of statements are not admissible pursuant to Rule 803(5), and the part of Hawley's motion seeking to bar their admission as substantive evidence will be granted.

■ ***ii. Use pursuant to Rule 612.*** The government also indicates that it will use the memoranda of the statements to refresh witnesses' memories, but not offer them into evidence, pursuant to Rule 612. Rule 612 states the following concerning a writing used to refresh a witness's memory:

> Except as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code, if a witness uses a writing to refresh memory for the purpose of testifying, either—
>
> > (1) while testifying, or
> >
> > (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains mat-

---

**8.** The few that were signed are the statements by Edward E. Marshall, Defendants' Exhibits AA and AC, and an affidavit by Justin Hoffman, Defendants' Exhibit AI.

ters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. 'Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one . striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

Fed.R.Evid. 612. Although the rule is cast primarily in terms of the adverse party's right to have the writing produced and how the adverse party may then use the writing, the Eighth Circuit Court of Appeals has explained that the rule "is a means to reawaken recollection of the witness to the witness's past perception about a writing." *United States v. Sheffield*, 55 F.3d 341, 343 (8th Cir.1995). When so used, "[t]he contents of such a writing may not even be read into evidence." *Id.*

Rule 612 "never has been construed to require that a writing used to refresh a witness's recollection must be independently admissible into evidence," however, and "[t]he case law holds to the contrary." *United States v. Shinderman*, 515 F.3d 5, 18 (1st Cir.2008) (citing *United States v. Kusek*, 844 F.2d 942, 949 (2d Cir.1988), and *United States v. Scott*, 701 F.2d 1340, 1346 (11th Cir.1983), and also citing JACK B. WEINSTEIN & MARGARET A. BERGER, 4 WEINSTEIN'S FEDERAL EVIDENCE § 612.03[3][b], at 612–14 (2d ed.2007)). Thus, the fact that the memoranda of the statements are hearsay not admissible pursuant to Rule 803(5) does not bar their use pursuant to Rule 612. ·

On the other hand, the proper application of Rule 612 where the writings are by government agents, not by the witnesses themselves requires further consideration. The Sixth Circuit Court of Appeals has explained,

> The propriety of permitting a witness to refresh his memory 'from a writing prepared by another largely lies within the sound discretion of the trial court. *See United States v. Faulkner*, 538 F.2d 724, 727 (6th Cir.1976) (citations omitted).

> Proper foundation requires that the witness's recollection to be exhausted, and that the time, place and person to whom the statement was given be identified. When the court is satisfied that the memorandum on its face reflects the witness's statement or one the witness acknowledges, and in his discretion the court is further satisfied that it may be of help in refreshing the person's memory, the witness should be allowed to refer to the document.

*United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir.1977) (quoting *Goings v. United States*, 377 F.2d 753, 760 (8th Cir.1967)) (quotation marks and added emphasis omitted). Upon establishing the proper foundation, "counsel will typically offer the witness the writing to inspect, and will show a copy of the writing to the opposing parties." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 612.03[4][a][i] (Joseph M. McLaughlin ed., 2d ed.2004) [hereinafter Weinstein's Federal Evidence] (citations omitted). "The best practice is for the trial court to have the witness silently read the writing and then to state whether the writing has refreshed his or her recollection." *Id.*

*Rush v. Illinois Cent. R. Co.,* 399 F.3d 705, 716 (6th Cir.2005). Even when a witness's memory is purportedly refreshed by the writing of another, the court must use care to prevent the writing from creating a false memory:

> Rule 612 requires a witness whose memory has been refreshed to testify from his present recollection, rather than to merely restate the contents of the writing. *See Shoupe,* 548 F.2d at 642 ("[I]f a party can offer a previously given statement to substitute for a witness' testimony *under the guise of 'refreshing recollection,'* the whole adversary system of trial must be revised.") (Internal quotation and citation omitted); *Faulkner,* 538 F.2d at 727 ("[C]aution must be exercised to insure that the document is not used to put words into the mouth of the witness."). *See also* 4 Weinstein's Federal Evidence § 612.02[2] ("Rule 612 is intended to curb the false memory that might occur when a witness who purports to testify based on a refreshed recollection merely parrots the contents of the writing.") (citing *Hall v. American Bakeries Co.,* 873 F.2d 1133,1136 (8th Cir.1989)).

*Rush,* 399 F.3d at 718.

Here, the court will require the government to lay the necessary foundation before permitting the government to use the memoranda of witnesses' statements, prepared by government agents, to be used at trial to refresh witnesses' memories pursuant to Rule 612. *Id.* at 716. Hawley has not shown, however, that the government *cannot* make the required foundational showing, or that the use of the memoranda of the statements will necessarily generate false memories or result in witnesses merely parroting the memoranda by the government agents, *see id.* at 718, so that the court will not prohibit pretrial any use of the memoranda of witnesses' statements

prepared by government agents as authorized by Rule 612.

Thus, to the extent that Hawley's motion seeks to prohibit use of the memoranda of witnesses' statements pursuant to Rule 612, the motion will be denied.

### 9. Evidence of plea agreements

### a. Arguments of the parties

Finally, Hawley seeks to exclude evidence of so-called Pretrial Diversion Agreements between the government and Sydney Windquist, Stanley Windquist, Michael Hoffman, and Timothy Eischeid, memoranda of "proposed" settlement or plea agreements between the government and Mark Hoffman, Sue Hoffman, Justin Hoffman, and Donald Kluver, and settlement agreements between the government and Edward Marshall, identified as Exhibits AM through AU in the Defendants' Appendix. Hawley contends that these agreements are inadmissible hearsay and double hearsay or should be excluded under Rule 403. Hawley also contends that these statements do not constitute co-conspirator admissions within the meaning of Rule 801(d)(2)(E), because they were not made during and in furtherance of the conspiracy, but only long after the various documents and insurance claims at issue were submitted and the claims and premium subsidies were paid.

 In its resistance, the government argues that the plea agreements of Donald Kluver and Mark Hoffman and the pretrial diversion agreements of Stanley Winquist and Sydney Winquist are admissible as admissions against interest pursuant to Rule 804(b)(3) or under the residual hearsay rule, Rule 807. The government represents that it is willing at this time to withdraw Ed Marshall's settlement agreement as an exhibit, but contends that the fact that Ed Marshall entered into a settle-

ment agreement should be admitted even if the terms of the actual agreement are excluded.

In reply, Hawley argues that statements against interest are only admissible when the declarant is unavailable, which is not the case here. Hawley also points out that the pleas by Kluver and Hoffman were *Alford* pleas, that is, pleas with no admission of guilt. Despite the government making no more than a passing reference to the issue, Hawley argues that the real question is whether the pleas are admissible as co-conspirator admissions. Hawley also argues that the pleas cannot be admitted under the residual hearsay exception of Rule 807, because the statements are not more probative than other evidence, and the interests of justice will not be served, where the government can call the witnesses to testify.

#### b. Analysis

The government's contention that the plea agreements are admissible as statements against the witnesses' interest pursuant to Rule 804(b)(3) need not detain the court long. As Hawley argues, Rule 804 exceptions expressly apply only when the declarant is unavailable, *see* FED.R.EVID. 804(b) ("The following are not excluded by the hearsay rule if the declarant is unavailable as a witness ...."), and the government has made absolutely no showing that the declarants in the plea agreements at issue will be unavailable at trial. Therefore, the court turns to the admissibility of the plea agreements pursuant to Rule 807, the residual hearsay exception.

As the Eighth Circuit Court of Appeals recently explained,

> Rule 807 allows for the admission of hearsay "not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness." In total, there are five re-

quirements for admissibility under Rule 807: 1) that the evidence have circumstantial guarantees of trustworthiness, 2) that the evidence be offered to prove a material fact, 3) that the evidence be more probative on the point offered than any other evidence which the proponent can procure through reasonable efforts, 4) that the proponent has served prior notice to the adverse party in advance of trial, and 5) that admission would comport with the general purpose of the rules and be consistent with the interests of justice. Fed.R.Evid. 807.

*United States v. Banks*, 514 F.3d 769, 777 (8th Cir.2008). The Eighth Circuit Court of Appeals has also "observed that 'Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances.'" *United States v. Ingram*, 501 F.3d 963, 967 (8th Cir.2007) (quoting *United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir.2005) (internal quotation omitted), *cert. denied,* —— U.S. ——, 127 S.Ct. 42, 166 L.Ed.2d 47 (2006)).

The court assumes, without deciding, that, under the broad "totality of the circumstances" test applicable to the determination of whether a statement proffered pursuant to Rule 807 has circumstantial guarantees of trustworthiness, *see Banks*, 514 F.3d at 777 (the first factor is whether there are circumstantial guarantees of trustworthiness); *see United States v. Shields*, 497 F.3d 789, 794 (8th Cir.2007) (applying a "totality of the circumstances test" to this requirement), a plea agreement generally has the necessary guarantees of trustworthiness, because a person generally will not subject himself or herself to criminal liability unless the statements on which the charges are based are true. The government intends to offer the plea agreements to prove the material fact that the declarants were involved in a fraudulent scheme to obtain crop insurance

benefits, and the court agrees that the existence of such a scheme is a material fact in this litigation. *Banks,* 514 F.3d at 777 (second factor is materiality of the evidence). The court also notes that the government has made clear its intent to use the plea agreements in this case sufficiently in advance of trial that the defendants could move in limine to exclude them. *See id.* (fourth requirement for admissibility under Rule 807 is sufficient timely notice of intent to use the hearsay in advance of trial).

Nevertheless, the court is not convinced that the plea agreements meet the other requirements for admissibility pursuant to Rule 807. As to probative value, *see id.* (third factor), the government argues that the evidence of plea agreements is more probative than testimony of the declarants, because jurors are more persuaded by plea agreements, where signing a plea agreement subjects the declarant to penalties. The court is not convinced that persuasive value is necessarily the same as probative value, nor is the court convinced that the plea agreements are more probative than direct testimony by the declarants concerning their involvement in a fraudulent scheme, particularly where, as Hawley points out, some of the pleas were *Alford* pleas, which are not necessarily admissions of guilt or admissions to certain facts, only admissions that the government can prove certain facts. *See North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (allowing a defendant to plead guilty without admitting guilt by acknowledging the government's evidence is sufficient to obtain a conviction). Nor is the court convinced that admission of the plea agreements would comport with the general purpose of the rules and be consistent with the interests of justice, *see Banks,* 514 F.3d at 777 (last factor), where, once again, the witnesses can be called to testify "live" and can be subjected to cross-

examination. Moreover, it seems to the court that both the Federal Rules of Evidence and the interests of justice are served when evidence that is more prejudicial than probative is excluded. *See, e.g.,* FED.R.EVID. 403. Here, evidence that associates of Russell Hawley have pleaded guilty to criminal charges stemming from what is alleged to be the same scheme may invite jurors to find against Hawley because of the association, rather than because of evidence demonstrating Hawley's own involvement in the conduct at issue in the government's claims. *See* FED.R.EVID. 403, Advisory Committee Notes (a decision on an "improper basis" is "commonly, though not necessarily, an emotional one."); *Adams,* 401 F.3d at 900 (unfairly prejudicial evidence has been described as evidence that is " 'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.' ") (quoting *Shoffner,* 71 F.3d at 1433).

In short, the court concludes that the plea agreements are not admissible under either of the Federal Rules of Evidence on which the government relies. Therefore, the part of Hawley's Motion In Limine seeking to exclude the plea agreements will be granted.

### III. CONCLUSION

Upon the foregoing,

1. The government's May 28, 2008, Motion In Limine To Bar Reference To Treble Damages, Penalties, And Reimbursement And Payment Procedures Between The Federal Crop Insurance Corporation (FCIC) And North Central Crop Insurance, Inc. (NCCI) (docket no. 33) is **granted in part and denied in part,** as follows:

 a. That portion of the government's motion seeking to exclude any references to provisions of the FCA permitting the court to award treble the dam-

ages awarded by the jury, 31 U.S.C. § 3729(a), and to award a civil penalty of not less than $5,000 and not more than $10,000 (now $5,500 to $11,000) for each FCA violation found by the jury, 28 C.F.R. § 85.3(a)(9) is **granted;** but

b. That portion of the government's motion seeking to exclude seeking evidence of reimbursement and payment procedures between the FCIC and NCCI and retention by the United States of premiums paid by the insureds pursuant to the SRA is **denied.**

2. The defendants' May 28, 2008, Motion In Limine Or In The Alternative, For Preliminary Rulings Under Fed.R.Evid. 104(a) (docket no. 34) is also **granted in part and denied in part,** as follows:

a. That part of the defendants' motion seeking to limit the government's proof to answers to interrogatories and requests for production provided before the close of discovery is **denied;**

b. That part of the defendants' motion seeking to exclude evidence of Hawley's tax returns and other evidence of both the individual defendant's and the corporate defendant's financial condition, income, and net worth is **denied;**

c. That part of the defendants' motion seeking to eliminate references to "experts" is **granted,** but only to the extent that the court will use the modified instruction shown above, while neither the court nor the parties will be prohibited from using the term "expert";

d. That part of the defendants' motion seeking to exclude evidence of experts' opinions on various matters is **granted in part and denied in part,** as explained more fully herein;

e. That part of the defendants' motion seeking to exclude evidence that Hawley, himself, purportedly forged applicants' signatures in the past will be **granted,** but that part of the defendants'

motion seeking to exclude evidence that Hawley has admitted accepting forged signatures in the past, without powers of attorney, is **denied;**

f. That part of the defendants' motion seeking to exclude evidence of the farming of the South Dakota crop land in years other than 2000 and 2001 and the farming of other crop land in 1998 and subsequent years will be **granted,** *except to the extent that such evidence is limited and offered only to provide the context for the relationship among the actors in this case,* while that part of the defendants' motion seeking to exclude evidence of Hawley's alleged involvement in asset transfers by Mark, Sue, and/or Justin Hoffman and their alleged bankruptcy fraud is **granted;**

g. That part of the defendants' motion seeking to exclude evidence of written memoranda of the statements of various witnesses secured by one or more employees or agents of the government is **granted,** to the extent that such evidence cannot be admitted pursuant to Rule 803(5), but **denied** to the extent that Hawley's motion seeks to prohibit use of the memoranda of witnesses' statements pursuant to Rule 612, although the government must establish the necessary foundation to use such evidence pursuant to Rule 612;

h. That part of the defendants' motion seeking to exclude the plea agreements of non-party witnesses is **granted.**

**IT IS SO ORDERED.**